UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOHN E. HUDSON,

                            Plaintiff,

          v.                                              **DECISION AND ORDER**
                                                          04-CV-1028S

GREYHOUND LINES, INC. and
GLI HOLDING COMPANY,

                            Defendants.

## I. INTRODUCTION

In this employment discrimination action, pro se Plaintiff John E. Hudson alleges that Defendants Greyhound Lines, Inc. and GLI Holding Company discriminated and retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), § 290 of the New York Human Rights Law ("NY HRL"), and the Civil Rights Act of 1870, as amended, 42 U.S.C. § 1981 ("§ 1981").

This Court has federal question jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over his state claims pursuant to 28 U.S.C. § 1367. Presently before this Court is Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]  For the reasons discussed below, Defendants' motion is granted.

_____

[1]In support of their motion, Defendants filed a memorandum of law, a Rule 56.1 Statement of Undisputed Material Facts, with exhibits, the Declaration of Ada W. Dolph, Esq., and a reply memorandum of law.  (Docket Nos. 71-78, 86.)  Plaintiff filed three submissions in opposition, the most substantive being a document captioned "Plaintiff [sic] Statement of Facts For Proper And Timely Notification."  (Docket Nos. 81-83.)

## II.  BACKGROUND

### A.    Procedural History

Plaintiff commenced this action on December 23, 2004, by filing a Complaint in the United States District Court for the Western District of New York.  (Docket No. 1.)  On February 16, 2006, this Court granted in part and denied in part Defendants' Motion to Dismiss the Complaint.  (Docket No. 17.)  At that time, Plaintiff's hostile work environment claims under federal and state law were dismissed, and his discrimination and retaliation claims were limited to those falling within the applicable statute of limitations periods as follows: Title VII claims occurring on or after January 11, 2002; § 1981 claims occurring on or after December 23, 2000; NY HRL claims occurring on or after December 23, 2001.

Plaintiff filed an Amended Complaint on May 22, 2006, alleging race discrimination and unlawful retaliation in violation of Title VII, § 1981, and the NY HRL.  (Docket No. 20.)  On November 3, 2006, Defendants filed a Motion for Judgment on the Pleadings seeking dismissal of Plaintiff's retaliation claims.  (Docket No. 37.)  In a Decision and Order filed September 11, 2007, this Court denied Defendants' motion, finding that Plaintiff had sufficiently plead his retaliation claims.  (Docket No. 87.)

Defendants filed the instant Motion for Summary Judgment on May 31, 2007. (Docket No. 71.)  Plaintiff filed submissions in opposition on July 10, 2007, and Defendants filed a reply memorandum on July 16, 2007.  (Docket Nos. 81-83, 86.)  This Court took the motion under advisement without oral argument.

**B.    Facts[2]**

Defendant Greyhound Lines, Inc.[3] ("Greyhound") operates a nation-wide bus service. (Defendants' Statement, ¶ 1.[4]) In 1975, Plaintiff began working for Greyhound as a driver in its Buffalo, NY terminal. (Defendants' Statement, ¶¶ 1-3; Plaintiff's Statement; ¶ 1.[5]) It appears that Plaintiff worked for Greyhound between 1975 and 1989 without incident. (Plaintiff's Statement, ¶ 2.) But then in 1990, Plaintiff injured his shoulder while unloading freight from his bus. (Defendants' Statement, ¶ 5; Plaintiff's Statement, ¶ 2.) Plaintiff filed a workers' compensation claim and returned to work in July 1993 after passing a driving "refresher course," a Department of Transportation physical, and a drug screening test. (Defendants' Statement, ¶¶ 5, 6; Plaintiff's Statement, ¶ 3.)

Two months after returning to work, Plaintiff re-injured his left shoulder and went out on leave again for the next eight years. (Defendants' Statement, ¶¶ 7, 9; Plaintiff's Statement, ¶¶ 4, 5.) He had surgery on his shoulder in April 1996 and again in December 2000. (Defendants' Statement, ¶ 8; Plaintiff's Statement, ¶¶ 9, 12.) In October 2001, Plaintiff received a return-to-work slip from his physician indicating that he could return to

---

[2]In his response to Defendants' motion, Plaintiff does not specifically controvert or address Defendants' Rule 56.1 Statement of Undisputed Facts. Given Plaintiff's pro se status, this Court will consider his submission liberally, and deem only those facts not discussed at all by Plaintiff as uncontroverted. See Local Rule 56.1(c) (statements of undisputed fact that are not controverted by the non-moving party are deemed admitted).

[3]It is undisputed that GLI Holding Company is a wholly-owned subsidiary of Greyhound Lines, Inc. that has never conducted business in New York and does not have any employees. (Defendants' Statement, p. 1.) Consequently, because it is not an employer, GLI Holding Company is not subject to liability for employment discrimination, and will therefore be dismissed from this case on that ground. See Tomka v. Seiler Corp., 66 F.3d 1295, 1313-16 (2d Cir. 1995), abrogated on other grounds by, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

[4]Referring to Defendants' Rule 56.1 Statement of Undisputed Material Facts, which contains citations to the record evidence. (Docket No. 74.)

[5]Referring to Plaintiff's Statement of Facts For Proper And Timely Notification. (Docket No. 81.)

work on November 13, 2001.  (Defendants' Statement, ¶ 9; Plaintiff's Statement, ¶ 13.)

On November 13, 2001, Plaintiff went to Greyhound's Buffalo terminal and presented his return-to-work slip to John Comstock, who was the driver supervisor. (Defendants' Statement, ¶ 10; Plaintiff's Statement, ¶ 14.)  Comstock advised Plaintiff that he could not return to work until he passed the driving "refresher course," the Department of Transportation physical, and a drug screening test.  (Defendants' Statement, ¶¶ 11, 13.) Plaintiff admits that he was aware that he needed to meet each of these requirements before he could return to work.  (Defendants' Statement, ¶ 12.)  Comstock offered to schedule Plaintiff for the three requirements and then contacted Greyhound's labor relations department to discuss Plaintiff's return to active duty.  (Defendants' Statement, ¶¶ 13, 14; Plaintiff's Statement, ¶ 17.)

Plaintiff maintains that Comstock told him it would take only five or ten days to complete this process.  (Plaintiff's Statement, ¶¶ 17, 18.)  Plaintiff waited until the end of November 2001, but never received a phone call or letter from Greyhound relative to his return to work.  (Plaintiff's Statement, ¶ 19.)  Plaintiff also maintains that he regularly visited the terminal to inquire about his status.  (Plaintiff's Statement, ¶¶ 20, 21.)

In the meantime, Greyhound's labor relations department directed Comstock to the risk management department for a determination as to whether Plaintiff was cleared to return to work.  (Defendants' Statement, ¶ 15.)  Vanessa Simon, a risk management department employee, instructed Comstock to halt Plaintiff's return to work until she could verify the status of Plaintiff's workers' compensation case with his caseworker. (Defendants' Statement, ¶ 15.)

Thereafter, in January 2002, Comstock received notices from the New York State Workers' Compensation Board advising that proceedings would continue on March 28, 2002.  (Defendants' Statement, ¶ 16.)  Comstock understood these notices to mean that Plaintiff's workers' compensation case was still active and consequently Plaintiff's return to work would need to be delayed until at least after March 2002.  (Defendants' Statement, ¶ 16.)

On March 12, 2002, Plaintiff telephoned Greyhound's human resources department in Dallas, TX to inquire about his status with the company.   (Defendants' Statement, ¶ 17; Plaintiff's Statement, ¶ 22.)  He spoke with Kim Labbe, who advised him that Greyhound's records showed that his employment was erroneously terminated on July 4, 1999, but was corrected that same day with a re-hire notation.  (Defendants' Statement, ¶¶ 17, 18; Plaintiff's Statement, ¶ 22.)   Sheila Talley, also of the human resources department, confirmed that Greyhound's records showed that Plaintiff was terminated on July 4, 1999.  (Defendants' Statement, ¶ 19.)   Plaintiff allegedly became angry and told Talley and Labbe that he was going to sue Greyhound for ten million dollars.  (Defendants' Statement, ¶ 21.)   Plaintiff admits that he probably used profane language during this exchange because he was "pissed off and had an attitude up to [his] neck."  (Defendants' Statement, ¶ 20.)

That same day — March 12, 2002 — Plaintiff telephoned Comstock at the Buffalo terminal and requested to see his personnel file, which Comstock permitted.  (Defendants' Statement, ¶ 22; Plaintiff's Statement, ¶ 23.)  When Plaintiff arrived at the terminal, he told Comstock about his July 4, 1999 termination, and said, "I see why you didn't call me back to work . . . because I was terminated July 4, 1999 . . . so that's the reason why you didn't

call me back to work."   (Defendants' Statement, ¶ 23.)   Plaintiff maintains that he discovered an insubordination memo in this file, and that when he asked Comstock about it, Comstock refused to let him review his file further.  (Plaintiff's Statement, ¶¶ 25-27.) Plaintiff then threatened to file a lawsuit.  (Plaintiff's Statement, ¶ 29.)

After this encounter, Comstock verified with the human resources department that Plaintiff's employment with Greyhound had previously been terminated and he was told to stop processing Plaintiff's return to work.   (Defendants' Statement, ¶ 24.)   Comstock telephoned Plaintiff and relayed this information to him.   (Defendants' Statement, ¶ 24.)

On March 14, 2002, Jim Smith from Greyhound's labor relations department contacted Comstock and told him that the human resources department's records were erroneous,  and that  Plaintiff remained on long-term disability status.    (Defendants' Statement, ¶ 25.) Smith asked Comstock to contact the risk management department and proceed with Plaintiff's return to work.   (Defendants' Statement, ¶ 26.)  Comstock spoke to Simon, who again told him to wait before processing Plaintiff's return to work until she received clearance from Plaintiff's workers' compensation case manager.   (Defendants' Statement, ¶ 27.)

Comstock eventually received permission to process Plaintiff's return to work. (Defendants' Statement, ¶ 29.)  In April 2002, he sent Plaintiff a letter offering him an unconditional return to active duty and advising him that his physical was scheduled for May 7, 2002.  (Defendants' Statement, ¶ 29.)  In the letter, Comstock advised Plaintiff that "it is imperative that you keep this appointment" and warned him that "failure to do so will subject you to discipline, up to and including discharge."   (Defendants' Statement, ¶ 30.) Plaintiff did not report for the scheduled physical examination.   (Defendants' Statement,

¶ 31.)

In June 2002, Mike Fleischhauer, Greyhound's district manager, sent Plaintiff a letter again offering him an unconditional return to active duty and advising him that a second appointment for a physical examination was scheduled for July 11, 2002. (Defendants' Statement, ¶ 32.)  Fleischhauer's letter contained the same warnings that Comstock's did but Plaintiff nonetheless failed to appear for the physical.   (Defendants' Statement, ¶¶ 33, 34.)

In August of 2002, Fleischhauer sent Plaintiff another letter offering him an unconditional return and advising him that a third appointment for a physical examination had been made for September 3, 2002.   (Defendants' Statement, ¶ 35.)  Despite the repeat of the warnings, Plaintiff failed to appear for the scheduled physical.  (Defendants' Statement, ¶¶ 36, 37.)

Plaintiff acknowledges that he received these three letters but maintains that he did not report for the physicals because he "would never be treated fairly from the history of the company up until that present time and all that had transpired."    (Defendants' Statement, ¶¶ 38, 39.)

Greyhound maintains that it terminated Plaintiff's employment due to his refusal to report for the scheduled physicals as directed by Comstock and Fleishhauer. (Defendants' Statement, ¶ 40.)  Plaintiff contends that he was fired because he is African-American and in retaliation for prior complaints that he filed.

## III.  DISCUSSION AND ANALYSIS

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law."  Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion."  Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be

resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)). Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to commercial or other areas of litigation." Id.

Finally, this Court notes that Plaintiff's pro se status entitles his submissions to broad consideration. Because of the distinct disadvantage that pro se litigants face, federal courts routinely read their submissions liberally, and interpret them to raise the strongest arguments that they suggest. See Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L.Ed.2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). "This is especially true when dealing with pro se complaints alleging civil rights violations." Weixel v. Bd. of Educ. of N.Y., 287 F.3d 138, 146 (2d Cir. 2002).

**B.     Plaintiff's Race Discrimination Claims**

Plaintiff asserts his race-based claims in the first, second, and fifth causes of action in his Amended Complaint pursuant to Title VII, § 1981, and the NY HRL, respectively. (Docket No. 20, ¶¶ 29-38; 39-48; 64-72.) It is well settled that discrimination claims under each of these provisions are analyzed under the same burden-shifting test first set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792,

802-04, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973).  <u>See</u> <u>Reeves v. Sanderson Plumbing</u> <u>Prods., Inc.</u>, 530 U.S. 133, 142-43, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (Title VII); <u>Rose v. Mendon Leasing Co.</u>, 969 F.Supp. 865, 867 n.2 (E.D.N.Y. 1997) (§ 1981 claims analyzed under Title VII framework) (citing <u>Taitt v. Chem. Bank</u>, 849 F.2d 775, 777 (2d Cir. 1988)); <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 n.1 (2d Cir. 2000) (identical standards apply to claims brought under Title VII and NY HRL § 296) (citing cases).

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1); <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003). When there is no direct evidence of discrimination, the <u>McDonnell Douglas</u> burden-shifting analysis applies.  It first requires that the plaintiff establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class, (2) he is qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination.  <u>Weinstock</u>, 224 F.3d at 42 (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).

If the plaintiff meets this initial burden and establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. <u>Texas Dep't of Comt'y Affairs v. Burdine</u>, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094, 67 L. Ed.2d 207 (1981)).  If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the

picture." Weinstock, 224 F.3d at 42 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993)).

Assuming that the defendant meets its burden at the second stage, the burden returns to the plaintiff to prove that the defendant's discrimination was intentional.  In this regard, the plaintiff must produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42.  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." Id.  But "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." Id. (quoting St. Mary's, 509 U.S. at 519).

1.     Plaintiff's *Prima Facie* Case

To establish a *prima facie* case of race discrimination, the plaintiff must set forth evidence that (1) he is a member of a protected class, (2) he was performing his duties satisfactorily, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination. See Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001);  Weinstock, 224 F.3d at 42 (citing McDonnell Douglas, 411 U.S. at 802).  "The burden of establishing a *prima facie* case of disparate treatment is not onerous." Burdine, 450 U.S. at 253; see also Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000) (characterizing burden as "minimal").

Greyhound argues that Plaintiff cannot establish a *prima facie* case of discrimination because he did not suffer an adverse employment action.  The Second Circuit defines an adverse employment action as a "materially adverse change" in the terms and conditions

of an individual's employment.  Sanders v. New York City Human Res. Admin., 361 F.3d

749, 755 (2d Cir. 2004); Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.

2000).

> To be materially adverse a change in working conditions must
> be more disruptive than a mere inconvenience or an alteration
> of job responsibilities.  A materially adverse change might be
> indicated by a termination of employment, a demotion
> evidenced by a decrease in wage or salary, a less
> distinguished title, a material loss of benefits, significantly
> diminished material responsibilities, or other indices unique to
> a particular situation.

Galabya, 202 F.3d at 640 (quotations, citations, and alterations omitted); see also Sanders,

361 F.3d at 755.  Because each case presents unique circumstances and there is no

bright-line rule, "courts must pore over each case to determine whether the challenged

employment action reaches the level of 'adverse.'"  Wanamaker v. Columbian Rope Co.,

108 F.3d 462, 465 (2d Cir. 1997).

Although Defendants argue that Plaintiff did not suffer an adverse employment

action, a liberal reading of Plaintiff's submissions reveals that along with complaining about

several non-adverse actions, he ultimately claims that Greyhound delayed scheduling the

necessary appointments for his return to work, and then terminated his employment.

Termination of employment is undoubtedly an adverse action for purposes of establishing

a *prima facie* case.  Moreover, given the minimal burden at this stage and Defendants'

proffer of a legitimate, non-discriminatory reason for terminating Plaintiff's employment

(discussed below), this Court finds it most expeditious in any event to assume the

existence of a *prima facie* case and move to the next stage of the analysis.  See Besht v.

Gen. Motors, 327 F.Supp.2d 208, 212-13 (W.D.N.Y. 2004) (citing United States Postal

12

Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d

403 (1983) ("Where the defendant has done everything that would be required of him if the

plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no

longer relevant.")); Wado v. Xerox Corp., 991 F.Supp. 174, 187 (W.D.N.Y. 1998).

### 2.    Greyhound's Legitimate, Non-Discriminatory Reason

The burden is now on Greyhound to produce a legitimate, non-discriminatory reason

for the delay in Plaintiff's return to work and his ultimate termination.  See Reeves, 530

U.S. at 142 (noting that the defendant's burden at the second stage is not one of proof or

persuasion, but is more appropriately considered a burden of production.)    "This

explanation must be 'clear and specific.'"  Gallo, 22 F.3d at 1226 (quoting Meiri, 759 F.2d

at 997).

Greyhound maintains that the delay in processing Plaintiff's return to work between

November 2001 and March 2002 was the result of Comstock's misunderstanding of

Plaintiff's workers' compensation case.  When Plaintiff initially appeared on November 13,

2001, with his return-to-work slip, Comstock advised him that he would put the process in

motion for Plaintiff's return to work by scheduling the required appointments — driving

"refresher course," physical examination, and drug screening test.    (Defendants'

Statement, ¶ 11, 13, 14.)  But when Comstock contacted Greyhound's risk management

department, he was told to hold Plaintiff's return to work until the status of his workers

compensation case could be verified.  (Defendants' Statement, ¶ 15.)  Comstock then

received notices from the Workers' Compensation Board that he understood, albeit

mistakenly, prevented Plaintiff's return to work.  (Defendants' Statement, ¶ 16.)  Comstock

also delayed processing Plaintiff's return to work because Greyhound's records indicated — again mistakenly — that Plaintiff had already been terminated. (Defendants' Statement, ¶¶ 17-19, 24, 25.)  Although certainly not desirable, this Court finds these errors to be legitimate, non-discriminatory reasons for the delay.

Greyhound further maintains that Plaintiff's termination came as the result of his own failure to appear for the physical examinations that were scheduled for him on three separate occasions.  Indeed, Plaintiff does not dispute that he received notice of the physical examinations Greyhound scheduled for him in May, July, and September 2002. (Defendants' Statement, ¶¶ 29, 32, 35.)  Each of the letters warned Plaintiff that his employment could be terminated if he failed to appear for the scheduled physicals. (Defendants' Statement, ¶¶ 30, 33, 36.)  Despite these explicit warnings, Plaintiff failed to appear on each occasion.  (Defendants' Statement, ¶¶ 31, 34, 37.)  Greyhound therefore terminated his employment.  (Defendants' Statement, ¶ 40.)  This Court finds Plaintiff's repeated failure to appear at required appointments to be a legitimate, non-discriminatory reason for Plaintiff's termination.

Because Greyhound has produced legitimate, non-discriminatory reasons for its actions, the presumption of discrimination created by Plaintiff's demonstration of a *prima facie* case "drops out of the picture." Hicks, 509 U.S. at 511.

### 3.      Pretext for Intentional Discrimination

The burden now returns to Plaintiff to demonstrate that Greyhound's non-discriminatory reasons are mere pretext for actual unlawful discrimination.  "Where a plaintiff has alleged that an employer's reasons for an adverse employment action are

pretextural, all reasonable inferences must be drawn in favor of the plaintiff's showing of pretext." Joseph v. Manhattan & Bronx Surface Transit Operating Auth., No. 96 Civ. 9015, 2004 WL 1907750, at *14 (S.D.N.Y. Aug. 25, 2004).

At this stage, the court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves, 530 U.S. at 143.)  This requires the court to determine whether "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir. 1999).

A defendant's proffered non-discriminatory reason, however, "cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." Olle v. Columbia Univ., 332 F.Supp.2d 599, 617 (S.D.N.Y. 2004) (quoting St Mary's, 509 U.S. at 502); see also AB v. Rhinebeck Cent. Sch. Dist., 224 F.R.D. 144, 153 n.9 (S.D.N.Y. 2004).  Therefore, to avoid summary judgment, Plaintiff must establish the existence of a genuine issue of fact as to whether Greyhound's proffered explanations are false and a mere pretext for unlawful discrimination. Weinstock, 224 F.3d at 42.  Unless Plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination, Greyhound is entitled to summary judgment.  See James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000).

In this Court's view, Plaintiff has failed to identify any evidence from which a jury could find that Greyhound delayed his return to work or fired him because he is black.

First, Plaintiff has set forth no evidence whatsoever from which it could reasonably be concluded that Greyhound's legitimate, non-discriminatory reasons are false.  In fact, at his deposition, Plaintiff stated that he told Comstock that, "I see why you didn't call me back to work . . . because I was terminated July 4, 1999 . . . so that's the reason why you didn't call me back to work."  (Defendants' Statement, ¶ 23.)  Plaintiff does not challenge or refute that Comstock simply misunderstood the workers' compensation documents or that Greyhound's computer records contained an error.

Second, the circumstances of Plaintiff's termination do not raise an inference of race discrimination.  It is undisputed that Greyhound scheduled Plaintiff to return to work as soon as it discovered that his workers' compensation case did not bar his return and that the notation that he had previously been terminated was a mistake.  Moreover, not only did Greyhound schedule Plaintiff's return to work, it gave him three separate opportunities to comply with the requirements for his return.  It was Plaintiff who chose not to appear for his scheduled physical examinations, which ultimately resulted in his termination.

Third, although Plaintiff identified Lou Novak and Larry Arble as Caucasian drivers who were on medical leave, brought in return-to-work slips, and were scheduled for physical examinations in compliance with Greyhound's policies, he has not presented any evidence to support his claims that these individuals were similarly-situated to him or were treated more favorably.  In fact, Plaintiff submitted a letter from Novak, but nowhere therein does he discuss his return to work from medical leave.  (Plaintiff's Statement, p. 12.)

But even assuming that Novak and Arble were similarly-situated, there is no evidence that they were treated more favorably.  At best, Novak and Arble returned to work

sooner than Plaintiff, but there is no evidence that their return to work was complicated by the legitimate mistakes present in Plaintiff's case.  As noted above, the scheduling delay in this case is attributable to two innocent mistakes, not to circumstances from which racial discrimination could reasonably be inferred.  Thus, Plaintiff has failed to establish that Greyhound treated similarly-situated, Caucasian employees more favorably than him.

There is no evidence anywhere in this record that Plaintiff was discriminated against because of his race.  Plaintiff has failed to carry his burden of setting forth evidence from which a reasonable trier of fact could conclude that Greyhound's legitimate, non-discriminatory reasons for the delay in his return to work and his ultimate termination are false, and that Greyhound actually discriminated against him on account of his race.  Greyhound is therefore entitled to summary judgment on these claims.  See Lizardo v. Denny's, Inc., 270 F.3d 94, 104 (2d Cir. 2001) (per curiam) (affirming district court's granting of summary judgment where the plaintiffs did "little more than cite to their mistreatment and ask the court to conclude that it must have been related to their race . . . This is not sufficient.")

## C.    Plaintiff's Retaliation Claims

Plaintiff asserts unlawful retaliation claims in the third and fourth causes of action in his Amended Complaint pursuant to Title VII, § 1981, and the NY HRL.  (Docket No. 20, ¶¶ 49-55; 56-63.)  When evaluating retaliation claims under these provisions of law, courts employ the McDonnell-Douglas burden-shifting analysis discussed above.  See Lizardo, 270 F.3d at 105 (applying Title VII framework to § 1981 retaliation claim); Schiano v. Quality Payroll Sys. Inc., 445 F.3d 597, 609 (2d Cir. 2006) ("retaliation claims under the

17

NYSHRL are generally governed by the same standards as federal claims under Title VII").

Title VII makes it unlawful for employers to retaliate against employees who participate in protected activities, such as challenging discriminatory practices or actions. 42 U.S.C. § 2000e-3(a); Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004). Under the burden-shifting test, the plaintiff must first establish a *prima facie* case of retaliation. If the plaintiff makes such a showing, the burden shifts to the defendant, who must proffer a legitimate, non-retaliatory reason for the employment decision at issue. If the defendant meets that burden, the plaintiff must demonstrate that "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Richardson, 180 F.3d at 443.

To establish a *prima facie* case of retaliation, Plaintiff must present evidence that (1) he participated in a protected activity, (2) his participation was known to Greyhound, (3) he suffered an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action. Richardson, 180 F.3d at 443; Jones v. Smithkline Beecham Corp., 309 F.Supp.2d 33, 356 (N.D.N.Y. 2004). In this Court's view, Plaintiff is unable to establish a *prima facie* case of retaliation.

Initially, it is somewhat difficult to ascertain what protected activity Plaintiff relies on in support of his claim. In his Amended Complaint, he includes only general allegations that he was "retaliated against because of [his] race, and because of [his] complaint[s] of discrimination and harassment," and that he "complained of and opposed unlawful discriminatory practices by defendants." (Docket No. 20, ¶¶ 15, 25, 50, 58.) Arguably more specific is Plaintiff's allegation that he "complained about the treatment to which [he]

was being subjected," but that was in reference to the delay in Greyhound's processing his return to work, not a complaint about discriminatory conduct.  (Docket No. 20, ¶ 20.) Although these allegations were sufficient to state a claim for pleading purposes, allegations alone cannot propel Plaintiff's claims through the summary judgment stage, and these allegations do not establish involvement in protected activity for purposes of presenting a *prima facie* case.

At his deposition, Plaintiff identified several incidents that he complained about during his years at Greyhound, including (1) his complaint to Greyhound about allegedly racist comments made before 1993; (2) various grievances that he filed before 1993; and (3) various complaints about work assignments and charter issues that he made before 1993.  (Docket No. 75-2, pp. 114-16.)  In an affidavit, Plaintiff maintains that the delay in his return to work was retaliation for him making these complaints years earlier.  (Docket 75-3, p. 7.)  Specifically, he attests that Jim Smith, who worked in the drivers' operations department at Greyhound's Dallas headquarters, told him that he recalled Plaintiff from his prior discrimination complaints.  (Docket No. 75-3, p. 7.)  Smith then allegedly told Plaintiff that he could not give him any more information and referred him to Greyhound's legal department, furthering the delay in Plaintiff's return to work.  (Docket No. 75-3, p. 7.)

But even assuming that Smith's comments to Plaintiff demonstrate Plaintiff's involvement in a protected activity (his prior complaints),[6] Greyhound's knowledge, and an

---

[6]It is not required that the conduct opposed actually constitute a violation of Title VII.  See Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999) ("[A] plaintiff need not establish that the conduct [he] opposed was actually a violation of the statute so long as [he] can establish that [he] possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated that law." (internal quotation and alteration omitted)).

adverse employment action (further delay in Plaintiff's return to work),[7] this Court finds that Plaintiff cannot sufficiently establish a causal connection between his protected activity and Greyhound's actions.

To establish a causal connection, a plaintiff must demonstrate that an adverse employment action "occurred in circumstances from which a reasonable jury could infer retaliatory intent." Parrish v. Sollecito, 258 F. Supp.2d 264, 268 (S.D.N.Y. 2003). This may be proven "indirectly, by showing that the protected activity was followed closely by discriminatory treatment . . . ." Gordon v. NY City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (the causal connection requirement "can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment"). "A close temporal relationship between a plaintiff's participation in a protected activity and an employer's adverse action is alone sufficient to establish causation . . . ." Parrish, 258 F. Supp.2d at 268 (citing Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001)). However, "if the temporal proximity alone is the basis for determining a casual connection, it must be very close." Parrish, 258 F. Supp.2d at 268 (citing Clark County Sch. Dist. v.

---

[7]The United States Supreme Court clarified the necessary showing a plaintiff must make to demonstrate an adverse employment action in the retaliation context. A plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (finding a reassignment of duties to be actionable retaliation, even though both former and present duties fell within the same job description). In this regard, whether the employment action at issue is materially adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 209 (2d Cir. 2006) (citing White, 126 S.Ct. at 2417.) This Court assumes without deciding that delaying an employee's return to work because he lodged prior complaints of discrimination meets the White standard for adverse actions. See 126 S.Ct. at 2415.

Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed.2d 509 (2001)).

Here, even assuming that the complaints Plaintiff lodged before 1993 constituted protected activity that Greyhound was aware of, it cannot reasonably be concluded (and there is no evidence) that the delay in Plaintiff's return to work some nine years later is causally connected.  And as for Plaintiff's termination, the intervening fact that Plaintiff failed to appear for three scheduled physical examinations, knowing that his failure to appear constituted grounds for termination, breaks any causal connection.  Most importantly, Plaintiff has presented no evidence that Comstock or any decision makers at Greyhound knew of his previous complaints, much less retaliated against him because of them.  Consequently, this Court finds that Plaintiff has failed to establish a *prima facie* case of unlawful retaliation.

But even assuming that Plaintiff has demonstrated a *prima facie* case, Defendant has proffered a legitimate, non-discriminatory reason for the delay in Plaintiff's return to work and his eventual termination, as discussed above in the context of Plaintiff's discrimination claims.  To defeat Greyhound's motion, Plaintiff would have to produce "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [retaliation] was the real reason for the discharge."  Stephens v. SUNY at Buffalo, 11 F.Supp.2d 242, 250 (W.D.N.Y. 1998) (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)).  Again, as previously discussed, Plaintiff has presented no evidence from which it could reasonably be concluded that Greyhound's legitimate, non-discriminatory reasons are false, and that retaliation was more likely the reason Greyhound terminated

Plaintiff's employment.  Consequently, Greyhound is entitled to summary judgment on Plaintiff's retaliation claims.

## IV.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted in its entirety.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 71) is GRANTED.

FURTHER, that Defendant GLI Holding Company is DISMISSED from this case.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.


Dated:        March 24, 2008
              Buffalo, New York


                                        /s/William M. Skretny
                                       WILLIAM M. SKRETNY
                                      United States District Judge

22